IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **ATTILA NAGY,** | Case No. 4:18 CV 416 |
| Petitioner, | Judge John R. Adams |
| v. | Magistrate Judge James R. Knepp, II |
| **UNITED STATES OF AMERICA,** | |
| Respondent. | REPORT AND RECOMMENDATION |

### INTRODUCTION

Petitioner Attila Nagy has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241. (Doc. 1). The Government filed a Response in Opposition (Doc. 10), and Petitioner filed a Reply (Doc. 12). This matter has been referred to the undersigned for general pretrial supervision to include a Report and Recommendation on the underlying Petition. (Doc. 2). For the reasons discussed below, the undersigned recommends the Petition be DENIED.

### BACKGROUND

It is undisputed that Petitioner was charged with, and convicted *in absentia* of acts of insurance fraud in Romania based on staged automobile accidents (on February 14, 2000 and March 10, 2001). Specifically, he was convicted of complicity to fraud and complicity to intellectual forgery as those offenses are defined by Romanian law.

Petitioner was the subject of two indictments in the Local Court of Oradea – case numbers 150/P/2003 and 87/P/2004. *In re Extradition of Nagy*, Case No. 17 MJ 3283 (N.D. Ohio) (Docs. 1-9, 21-5) (hereinafter "*Extradition*"). He was initially indicted in April 2004 for the crimes alleged

to have occurred on February 14, 2000 and March 10, 2001, and was subsequently charged in a second indictment in January 2006 for the March 2001 incident. *See id.*

Petitioner was tried *in absentia* on both indictments in September 2007. Petitioner's sentence was initially suspended and he was sentenced to six years' supervised probation. *Extradition*, Doc. 21-3, at 86. In May 2012, Petitioner was found to be a probation violator and his conditional suspension of sentence revoked. *Id.* at 94-100. A detention order was issued in November 2012 which noted the revocation of conditional suspension, and ordered Petitioner to serve an aggregate sentence of three years' and four months' imprisonment. *Id.* at 102-05. Romania submitted a request for Petitioner's extradition to the United States Department of State on December 30, 2013. *Id.* at 1-5.

The Government filed a Complaint for Extradition on November 13, 2017. *Extradition*, Doc. 1. Following an extradition hearing on January 11, 2018, the court issued an Order, Certification and Committal for Extradition. *Extradition*, Doc. 18; *see also Extradition*, Doc. 22 (transcript of extradition hearing). Therein, the court found it had jurisdiction over the extradition proceedings and Petitioner; the offenses charged where extraditable under the treaty; and there was probable cause to believe that Petitioner committed the offenses of which he was charged and convicted. *Extradition*, Doc. 18. The court also rejected Petitioner's arguments against certification for extradition on the basis of lapses of time. *Id.* at 6-7.

Petitioner then filed the pending petition for writ of habeas corpus under 28 U.S.C. § 2241 (Doc. 1), which Respondent opposed (Doc. 10), and Petitioner replied (Doc. 14).

## STANDARD OF REVIEW

Because certification of extraditability is not a not a final order, there is no direct appeal from an order certifying extradition. The only method of review is through collateral habeas corpus

proceedings. 18 U.S.C. § 3184; 28 U.S.C. § 2241; *Collins v. Miller*, 252 U.S. 364, 369 (1920); *Haxhiaj v. Hackman*, 528 F.3d 282, 285-86 (11th Cir. 2008).

"The scope of habeas review of an extradition action is highly constrained." *In re Extradition of Drayer*, 190 F.3d 410, 415 (6th Cir. 1999). A habeas court reviewing a certification and order of extradition is limited to reviewing: 1) "whether the magistrate had jurisdiction"; 2) "whether the offense charged is within the treaty"; and 3) "whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *Drayer*, 190 F.3d at 415.

## DISCUSSION

Petitioner does not dispute that the Magistrate Judge conducting the extradition proceedings had jurisdiction, nor does he dispute there was a valid treaty in effect at the time of the extradition hearing within which the charged offenses fell. Rather, Petitioner challenges the Magistrate Judge's probable cause determination, and raises challenges to the timeliness of the extradition request. Specifically, Petitioner argues:

1. The Magistrate failed to dismiss the extradition proceedings on the legal ground that Article 6 of the extradition treaty between the United States and Romania barred [Petitioner's] extradition due to the lapse of time;

2. The Magistrate failed to dismiss the extradition proceedings on the legal ground that there was undue delay between [Petitioner's] convictions in absentia in Romania and the demand by the Romanian government to the United States government for [Petitioner's] extradition;

3. The Magistrate failed to dismiss the extradition proceedings on the legal ground that there was undue and substantial delay in the commencement of extradition proceedings by the United States government against [Petitioner] that violated his right to due process of law.

4. The Magistrate erred because the evidence submitted by the United States did not establish probable cause the [Petitioner] committed crimes in Romania. It only established probable cause that [Petitioner] was convicted of crimes in Romania *in absentia.*

3

(Doc. 1, at 6-7).[1] The Government responds there is sufficient evidence to support the probable cause determination, and Petitioner's other assignments of error lack merit. For the reasons discussed below, the undersigned recommends the Petition be denied.

Because Petitioner does not dispute the jurisdiction of the Magistrate Judge, or that the offenses charged fell within the treaty, the undersigned turns to the probable cause determination.

Probable Cause

Petitioner contends the evidence presented at the extradition hearing "only established probable cause that [Petitioner] was convicted in absentia of crimes in Romania and did not establish probable cause that he committed the crimes as charged." (Doc. 1, at 11). He presents very little argument on this point. *See id.* at 11-12.[2] In opposition, Respondent contends the record amply supports the Magistrate Judge's finding of probable cause. (Doc. 10, at 17-20).

On habeas review of an extradition order, the Court must review "whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez*, 268 U.S. at 312; *Drayer*, 190 F.3d at 415. "An extradition proceeding is not a forum in which to establish the guilt or innocence of the accused; rather, the sole inquiry is into probable cause." *Drayer*, 190 F.3d at 415. The undersigned finds ample such evidence supports the probable cause finding in the extradition proceedings here.

The Magistrate Judge explicitly found that there was "probable cause to believe that . . . [Petitioner] committed the offenses for which the aforesaid judgments of conviction were entered

---

1. Petitioner also challenges the Magistrate Judge's bond determination, however that determination is not at issue here.
2. Petitioner's entire argument on this point is: "A review of the evidence presented at the Extradition Hearing reveals that there was probable cause shown by the United States that Mr. Nagy was convicted of crimes in absentia in Romania. It does not establish probable cause that Mr. Nagy committed the crimes for which he was charged." (Doc. 1, at 12).

4

*in absentia* and for which extradition is sought." *Extradition*, Doc. 1, at 6. In support of its Complaint, and at the hearing, the Government presented the extradition request from Romania, and supporting documentation, including supplemental responses to requests from the United States. *See Extradition*, Docs. 1-1 to 1-10; 21-2 to 21-5.

Here, Petitioner was charged in Romania with (and convicted *in absentia* of) complicity to fraud (in violation of Article 26 of the Romanian Penal Code, in conjunction with Article 215(2) and (3) of the Penal code), and complicity to intellectual forgery (Article 289(1) of the Romanian Penal Code in conjunction with Article 26 of the Penal Code). Those statutes provide:

> **Art. 26 of the Penal Code – Accomplices**
> An accomplice is a person who intentionally facilitates or helps in any way the commission of an act provisioned in the penal law. A person who promises, either before or during the commission of the offence, to conceal the proceeds emerging from it or to favour the perpetrator, even if after the commission of the offence the promise is not kept, shall also be an accomplice.
>
> **ART. 215 (2) and (3) of the Penal Code – Fraud**
> Fraud committed by using untruthful names or capacities or other fraudulent means, shall be punished by imprisonment from 3 to 15 years. If the fraudulent means is in itself an offence, the rules for concurrence of offences shall apply.
>
> The act of deceiving or maintaining the deceit of a person, when concluding or executing a contract, if, without this error, the deceived person had not concluded or executed the contract in the conditions stipulated, shall be sanctioned by the penalty provisioned in the previous paragraphs, according to the distinctions shown there.
>
> **ART. 289 (1) of the Penal Code – Intellectual forgery**
> The act of forging an official document when it is drawn up, committed by a clerk during the exercise of service prerogatives, by certifying untrue acts or circumstances or by omitting, in awareness, to insert certain data or circumstances, shall be punished by imprisonment from 6 months to 5 years.

*Extradition*, Doc. 21-3, at 21.

In its original complaint for extradition, and in the extradition hearing, the Government introduced evidence from the judgment of the Local Court of Oradea in Romania in case number 150/P/2003 that Petitioner:

> abetted in the set-up of a traffic accident on the territory of Hungary, made a false statement on its occurrence, requested and received a copy of the car's documents from defendant Mate Ferenc, that he subsequently delivered to be used by the police officer from the Republic of Hungary in preparing the document establishing the collision and thus misleading the Hungarian insurance company which paid compensations based on the insurance contracts, but the prejudice caused affected the correspondent Romanian insurance company, namely S.C. Grupul de Asigurari Roman – Grup As S.A. which satisfied the proceedings for the recourse of S.C MABISZ GKI Budapest (the Hungarian insurer).

*Extradition*, Doc. 21-3, at 17; *see also* Doc. 22, at 11-16 (introducing documents at extradition hearing). Supporting evidence cited by the Romanian court included testimony of co-defendant Mate Ferenc:

> The car accident report prepared by the Police Authorities in Hungary reveals that "the means of transportation with registration plates BH – 03 – HHH, driven by Mate Ferenc, because he failed to comply with the traffic regulations at the crossroads of Derkovics Gyula street and Komjath street, collided with the transportation means with registration plates HDD – 153, BMW brand, driven by Skhleiner Gyula, Mate Ference being guilty for causing the accident."
>
> The report acknowledging the collision, concluded by the police authorities of the Republic of Hungary proved to be false. In his statement . . . Mate Ferenc admitted that the car with registration plates BH – 03 – HHH was not in the Republic of Hungary on 14.02.2000, and that, at the request of Nagy Attila, he concluded a green card insurance policy for the car . . . , that he gave Nagy Atilla a copy of the insurance policy, a copy of his identity documents and a copy of the car related documents, and then he declared to the inspectors of Grup As that he was involved in the collision occurred on 14.02.2000.

*Extradition*, Doc. 21-3, at 40-41; *see also id.* at 35 (describing Ferenc's testimony). Ferenc's wife also corroborated these statements. *Id.* at 41. Further, Romanian court documents introduced state that "car BH – 03 – HHH exited Romania with defendant Mate Ferenc on 15.02.2000 and not on 14.02.2000" when the traffic accident was reported to have occurred in Hungary. *Id.* at 41. The

6

Government also introduced the statements of prosecutor Cercel Sasa that Petitioner "requested and received the copy of the documents from the accused person Mate Ferenc, that he then delivered to be used by the police officers from the Republic of Hungary for the conclusion of the report acknowledging the collision." *Extradition*, Doc. 21-4, at 30.

At the extradition hearing, the Government also introduced evidence from the Local Court of Oradea in Romania in case number 87/P/2004 that Petitioner

> in full awareness of his facts and according to a pre-established plan, by his offence related activity, he facilitated and aided the perpetration of the offence of fraudulent misrepresentation by fraudulent means, together with the named Vasiliu Romeo and other non-identified persons, namely generating a false official document attesting to the occurrence of a traffic accident between a car registered in Romania, insured on a "green card" system and a car registered in Hungary, belonging to a Hungarian citizen, based on which the insurance company in Hungary received indemnification from the insurance company in Romania, causing a prejudice to the latter.

*Extradition*, Doc. 21-3, at 17-18. Further, in its judgment, the court explained the conviction was supported by Romeo's testimony:

> The car accident report indicated above has a fictitious nature, attests to the occurrence of the insured even – collision in an untrue manner because . . . Vasiliu Romeo declared as follows: he went to Budapest on 10 March 2011 (see the letter of Border Police on page 353 confirming that the car and driver Vasiliu Romeo exited Romania), where he was contacted by a person, Nagy Attila, who asked for his car, the car document and green card, as well as for his identity documents. Vasiliu Romeo gave them to him and the respective person left with the car and came back after a while, Vasiliu Romeo found that the car had no trace of damage caused by the collision, and however, he signed the car accident report on page 351 attesting that the car with registration no. SJ-16-ADI was involved in a collision.

*Id.* at 44; *see also id.* at 78 ("it was established without any doubt that the person to whom Vasiliu Romeo gave the documents which were used to conclude a fictitious report acknowledging the collision is defendant Nagy Attila.").

Although Petitioner does not present a fully developed argument on this point, it appears he objects to Government's presentation of, and the Magistrate Judge's reliance upon documents

7

from his *in absentia* conviction. "A foreign conviction entered after a trial at which the defendant was present suffices, in and of itself, to establish probable cause." *Haxhiaj v. Hackman*, 528 F.3d 282, 290 (4th Cir. 2008) (citing *Spatola v. United States*, 925 F.2d 615, 618 (2d Cir. 1991); *Restatement (Third) of Foreign Relations Law in the United States* § 476 comment b (1987)). In *Haxhiaj*, however, the Fourth Circuit also found probable cause could be supported by an *in absentia* conviction where the underlying court opinion sets forth sufficient facts to establish probable cause. *See* 528 F.3d at 291 (finding facts contained in certified copy of an appellate opinion of an Italian court affirming *in absentia* conviction sufficient to establish probable cause). Specifically, in *Haxhiaj*, the Fourth Circuit explained:

> In view of the record evidence in this case, it is unnecessary for us to weigh in on the question of whether the fact of a foreign conviction, without more, can ever be sufficient to establish probable cause under § 3184 when the conviction resulted from a trial conducted *in absentia*. Even assuming that the fact of an *in absentia* conviction by itself is an insufficient basis *per se* for a finding of probable cause, the government presented more than just the fact of conviction. As detailed previously, the excerpts from the appellate opinion go well beyond the mere verdict, summarizing the underlying evidence amassed against Haxhiaj and his co-conspirators.

*Id.* (footnote omitted). The Court therefore concluded "that the evidentiary summary contained within the opinion of the Court of Appeal in Milan is within the scope of evidence that the extradition court may consider in making its limited preliminary decision under § 3184." *Id.* at 292. Other courts have reached similar conclusions, relying upon underlying court documents to establish probable cause. *See In re Extradition of Bilanovic*, 2008 WL 5111846, at *11 (W.D. Mich.) ("The facts set forth in the Verdict of the Municipal Court clearly establish the presence of probable cause to believe that Eset Bilanovic is guilty of the murder of Muharem Corhusic on February 9, 1995."); *In re Extradition of Camelo-Grillo*, 2017 WL 2945715, at *7 (C.D. Cal) ("However, even a conviction obtained *in absentia* that is supported by the foreign court's written decision setting forth the facts underlying the conviction has been found to 'afford[] a reasonable

8

basis upon which to find probable cause.'") (quoting *Haxhiaj*, 528 F.3d at 289); *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1163-66 (11th Cir. 2005) (unsworn 106-page indictment which contained "detailed" summaries of witness statements and other hearsay evidence, was "sufficiently reliable evidence" on which to base probable cause finding); *Zanazanian v. United States*, 729 F.2d 624, 627 (9th Cr. 1983) (summaries of accomplice witness statements and other evidence contained in police reports sufficient to establish probable cause).

Thus, given the evidence outlined above from the Romanian court documents, the undersigned recommends the court find the extradition court's probable cause conclusion – that there was probable cause to believe Petitioner committed complicity to fraud and complicity to intellectual forgery as those crimes are defined by Romanian law – supported; that is, there was sufficient "evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez*, 268 U.S. at 312. Given the case law cited above, this is so even though the evidence relied upon was in the form of court documents from Petitioner's *in absentia* conviction.

Delay

Petitioner further argues extradition is barred by Article 6 of the Extradition Treaty, the Sixth Amendment's speedy trial clause, and procedural due process. (Doc. 1, at 8). Respondent contends such arguments fail. Other courts have found that the scope of habeas review in international extradition cases includes an examination of procedural defects in the extradition process that are of a constitutional magnitude. *See, e.g., Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 829 (8th Cir. 1993) ("The United States' actions in reviewing a request for extradition are, of course, subject to the constraints of the Constitution."); *Gill v. Imundi*, 747 F. Supp. 1028, 1039 (S.D.N.Y. 1990) ("Thus, *habeas* remains available as a means by which the extraditee may test the legality of the extradition proceedings, and . . . such testing subjects to examination the

9

extradition proceeding's conformance with the requisites of the extradition laws and treaties and, if called for, the Constitution and international law.") (internal quotation and citation omitted).

Here, Article 6 of the Treaty provides:

> Extradition may be denied if prosecution of the offense or execution of the penalty is barred by lapse of time under the laws of the Requesting State. Acts that would interrupt or suspend the prescriptive period in the Requesting State are to be given effect by the Requested State.

*Extradition*, Doc. 1-3, at 23. As the extradition court properly found, this provision only bars extradition based on "lapse of time *under the laws of the Requesting State*", which here is Romania. *Id.*; *see also Extradition*, Doc. 18, at 6-7. Petitioner has cited no such Romanian law. Thus, Petitioner's argument that "the Speedy Trial Clause [is] a central component of American legal protections against untimely prosecution" (Doc. 1, at 9), is inapplicable in these circumstances.

Further, the Sixth Circuit has rejected the argument that the speedy trial clause applies to international extradition cases. *Martinez v. United States*, 828 F.3d 451, 457 (6th Cir. 2016) ("When the Sixth Amendment says 'all criminal prosecutions' it refers to all prosecutions in *this country*, not anywhere else in the world."); *see also Martin*, 993 F.2d at 829 ("Constitutional procedural protections which by their terms are applicable only in criminal cases, however, are unavailable in extradition proceedings. Accordingly, there is no Sixth Amendment right to a speedy trial in extradition cases."). The cases cited by Petitioner in support of his contention that "it is well established that criminal defendants may raise a speedy trial defense when the U.S. government has failed to timely pursue their extradition" (Doc. 1, at 9), are not to the contrary. Rather, these cases apply the speedy trial clause to criminal cases prosecuted *in the United States*. *See id.* at 9-10 (citing *Doggett v. United States*, 505 U.S. 647, 651-58 (1992); *United States v. Heshelman*, 521 F. App'x 501, 505-10 (6th Cir. 2013); *United States v. Mendoza*, 530 F.3d 758,

763 (9th Cir. 2008)). That is, these cases address of the extradition of American fugitives *to* the United States rather than *from* the United States to other countries.

Courts have also rejected arguments such as Petitioner's that due process imposes time limits on the extradition process itself. This includes both delays in the foreign country seeking extradition, and delays by the United States in prosecuting the extradition case. *See, e.g.*, *Drayer*, 190 F.3d at 415 (holding a fourteen year delay between the issuance of a Canadian arrest warrant and Canada's formal request for extradition did not abridge a petitioner's Fifth Amendment due process rights); *Martin*, 993 F.2d at 829 (seventeen year delay in requesting extradition did not violate due process and bar extradition); *McMaster v. United States*, 9 F.3d 47, 48-49 (8th Cir.1993) (finding no due process rights in extradition proceeding unless the United States bases extradition upon impermissible factors such as race, creed, sex or other exceptional constitutional limitation, and finding no violation from a four year delay between request and extradition) (citing *In re Burt*, 737 F.2d 1477, 1487 (7th Cir. 1984)); *Kamrin v. United States*, 725 F.2d 1225, 1227 (9th Cir. 1984) (holding that unless extradition treaty itself guarantees full United States rights to due process, they do not apply); *In re Extradition of Kraiselburd*, 786 F.2d 1395, 1398 (9th Cir. 1986) (three year delay between Argentina's request for extradition and United States' institution of extradition proceedings did not violate due process). As one court explained: "It would make little sense to provide an extradition defendant indirectly with a right to a speedy trial under the Fifth Amendment when he enjoys no such right directly under the Sixth Amendment." *Martin*, 993 F.2d at 829.

Petitioner may raise his arguments regarding delays in the process to the Secretary of State, who makes the ultimate extradition decision. *See, e.g., Martin*, 993 F.3d at 830 ("Martin should direct his argument that extradition is unjust in this case based on Canada's alleged lengthy delay

in seeking extradition or on humanitarian grounds to the Executive Branch."); *Kamrin*, 725 F.2d at 1227 ("When the United States is the requested country, delay in seeking extradition may be relevant to the Secretary of State's final determination as to whether extradition may go forward. The delay may not, however, serve as a defense to judicial extradition proceedings.").

## CONCLUSION

Following review, and for the reasons discussed above, the undersigned recommends the Petition (Doc. 1) be DENIED.

  s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).